UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


JOANNA M. CARTER,

              Plaintiff,              CIVIL ACTION NO. 08-15133

      v.                   DISTRICT JUDGE BERNARD A. FRIEDMAN

COMMISSIONER OF            MAGISTRATE JUDGE MARK A. RANDON
SOCIAL SECURITY,

              Defendant.

_____/

**REPORT AND RECOMMENDATION
ON CROSS-MOTIONS FOR SUMMARY JUDGMENT**

## I.    PROCEDURAL HISTORY

### A.    *Proceedings in this Court*

On December 12, 2008, Plaintiff Joanna Carter (Plaintiff) filed the instant suit.  Pursuant

to 28 U.S.C. § 636(b)(1)(B) and Local Rule 72.1(b)(3), this matter was referred to the

undersigned for the purpose of reviewing the Commissioner's decision denying Plaintiff's claim

for a period of Social Security Disability (DIB) and Supplemental Security Income (SSI) benefits

(Dkt. No. 16).  This matter is currently before the Court on cross-motions for summary judgment

(Dkts. No. 12, 15).

For the reasons set forth below, it is **RECOMMENDED** that Plaintiff's motion for

summary judgment be **DENIED**, Defendant's motion for summary judgment be **GRANTED**,

and that the findings of the Commissioner be **AFFIRMED**.

**B.**      *Administrative Proceedings*

Plaintiff filed an initial application for DIB and SSI benefits on May 21, 2003, alleging disability beginning on December 9, 2002 (Tr. 61-63, 258-262).  These applications were denied on July 23, 2003 (Tr. 49-53, 264-267) and Plaintiff did not appeal this adverse determination.  Instead, Plaintiff filed a new application on July 7, 2004, again alleging that she became unable to work on December 9, 2002 (Tr. 61); this second claim forms the subject of the present action.  Plaintiff's second claim was initially disapproved by the Commissioner on September 7, 2004 (Tr. 54).  Plaintiff then requested a hearing before an ALJ (Tr. 59).  On February 10, 2006, ALJ Jerome B. Blum issued a Notice of Dismissal (Tr. 274-76).  The ALJ dismissed the case because Plaintiff's counsel did not reply to the ALJ's request to submit a typewritten narrative report from Plaintiff's treating doctors, despite two requests from the ALJ to do so (Tr. 276).  The ALJ, therefore, determined that Plaintiff's case had been abandoned (Tr. 276).  Plaintiff appealed the ALJ's Notice of Dismissal to the Appeals Council (Tr. 277-78).  On May 19, 2006, the Appeals Council vacated the ALJ's Order of Dismissal and remanded the case (Tr. 280-83), ordering the ALJ to provide Plaintiff with the opportunity for a hearing (Tr. 282).

On February 14, 2008, Plaintiff appeared with counsel and testified before ALJ Blum.  James Fuller testified as a vocational expert (Tr. 526-40).  At the beginning of the hearing, Plaintiff's counsel indicated that Plaintiff was amending her alleged onset date to January 1, 2003 (Tr. 528-29).  On March 10, 2008, ALJ Blum determined that Plaintiff was not disabled because she could perform her past relevant work as a housekeeper (Tr. 22-27).  Plaintiff requested Appeals Council review but, on October 17, 2008, the Appeals Council denied her request for

-2-

further review; at that point, the ALJ's decision became the Commissioner's final decision in this case.  Plaintiff now seeks judicial review of the Commissioner's final decision.  *See* 42 U.S.C. §§ 405(g), 1382c.

## II.    STATEMENT OF FACTS

### A.    *ALJ Findings*

Plaintiff was 50 years of age at the time of the most recent administrative hearing (Tr. at 529).  The ALJ applied the five-step disability analysis to Plaintiff's claim and found at step one that Plaintiff had not engaged in substantial gainful activity since July 24, 2003, when her previous unsuccessful application for benefits was no longer res judicata (Tr. 24).  At step two, the ALJ found that Plaintiff suffered from the following "severe" impairments: encephalopathy, left mastoiditis and tympanosclerosis; gastroparesis and acid reflux; and status post-chemo and radiation therapy for cancer of the sinus (Tr. 25).  At step three, the ALJ found no evidence that Plaintiff's combination of impairments met or equaled one of the listings in the regulations (Tr. 26).  Between steps three and four, the ALJ determined that Plaintiff retained the residual functional capacity (RFC) to perform unskilled light work (Tr. 26).  To reach this conclusion, the ALJ found that while Plaintiff's impairments could reasonably be expected to produce her alleged symptoms, her statements concerning the intensity, duration, and limiting effects of these symptoms were not entirely credible (Tr. 26).  At step four, the ALJ found that Plaintiff remained capable of performing her previous work as a housekeeper (Tr. 26).  The ALJ, therefore, found Plaintiff not disabled and terminated the analysis at step four (Tr. 26-27).

**B.** *Administrative Record*

**1.**    **Plaintiff's Testimony and Statements**

Plaintiff testified that she stopped working in either 2002, or 2003, after working for eight years as a housekeeper for Scott's Management (Tr. 529). Plaintiff testified that her previous work required her to lift mops weighing 5-10 pounds, and that the job required her to either be on her feet or her knees throughout the working day (Tr. 530). Plaintiff testified that she stopped working after undergoing chemotherapy for esophageal cancer (Tr. 530). Plaintiff testified that she underwent this chemotherapy and radiation therapy in 1998 (Tr. 530). Plaintiff described herself as cancer-free as of the date of her hearing (Tr. 530). Plaintiff described her current problems as a stiff neck, a loss of hearing in her left ear, and swollen glands throughout her body (Tr. 531).

Plaintiff also alleged that she experienced dizzy spells on a daily basis and stated that the dizziness could last for up to one or two hours (Tr. 531). Plaintiff testified that she experienced headaches on a daily basis and stated that the headaches could last for up to one hour (Tr. 532). Plaintiff stated that she took Tylenol for her headaches (Tr. 532). Plaintiff also alleged that she had a "really bad" stomach and that she found herself either running to the bathroom all the time or not going at all (Tr. 532). Plaintiff testified that, although she had not experienced a seizure since 2006, she had suffered at least one grand mal seizure for which she was hospitalized (Tr. 533). Plaintiff further testified that left carpal tunnel syndrome rendered her unable to hold anything in her left hand (Tr. 534). Plaintiff described a neck problem that required an injection (Tr. 535). She alleged that if she put her head down or up her neck would spasm (Tr. 535).

-4-

Plaintiff stated that she lived with her aunt and testified that her aunt performed most of the household chores (Tr. 537). Plaintiff limited her activities to watching television and trying to clean the laundry and dishes that she used (Tr. 537). Plaintiff stated that sitting was not a problem for her, but said she experienced problems on getting up and moving around (Tr. 538). Plaintiff also testified that she could lift twenty pounds consistently throughout the day (Tr. 538).

### 2.    Medical Evidence

The record contains extensive medical records for Plaintiff, which can be summarized as follows: It appears that Plaintiff began treatment with a Dr. Douglas F. Hegyi in October, 2000; indeed, a letter from Dr. Hegyi to a Dr. Keith Tom dated October 30, 2000, thanks Dr. Tom for his referral of Plaintiff (Tr. 176). Dr. Hegyi's initial evaluation found numbness in Plaintiff's left cheek, and a left eustachian tube dysfunction secondary to radiation therapy from nasopharyngeal carcinoma (Tr. 176). Dr. Hegyi stated that he would consider putting a PE tube back in Plaintiff's ear to allow her to hear better (Tr. 176). On December 22, 2000, Dr. Hegyi reported that Plaintiff was doing much better in terms of her hearing (Tr. 175). As of June 25, 2001, Dr. Hegyi stated that he would watch Plaintiff every six months to see if there was any growth in her nasopharynx (Tr. 174). As of March 1, 2002, after registering some complaints about drainage in her ears, Plaintiff reported no further drainage and she told Dr. Hegyi that she could hear pretty well (Tr. 172). On September 6, 2002, Plaintiff again reported that her hearing was good (Tr. 171).

On October 13, 2002, Keith B. Tom, D.O., filled out a "Medical Examination Report" form for Plaintiff (Tr. 287-88). Dr. Tom indicated that Plaintiff's disability was temporary, but

he did not state an expected "return to work" date (Tr. 288).  Dr. Tom opined that Plaintiff could lift 10 pounds occasionally and that she could stand and/or walk for less than two hours in an eight-hour day as well as sit for about six hours in an eight-hour day (Tr. 288).

On November 8, 2002, Plaintiff complained of drainage from her left ear (Tr. 170).  Dr. Hegyi recommended irrigations of the left ear (Tr. 170).  As of November 27, 2002, Dr. Hegyi did not see any left ear drainage, despite a perforation space (Tr. 170).

On March 24, 2003, Plaintiff returned to Dr. Hegyi for follow-up for nasopharyngeal carcinoma, status-post radiation and chemotherapy (Tr. 169).  Under the heading "Plan" Dr. Hegyi commented, "I don't think anything further needs to be done" (Tr. 169).  There was, however, a recommendation for Plaintiff to use saline irrigations in her nose (Tr. 169).

A record from St. John Oakland Hospital dated June 26, 2004, indicated that Plaintiff had suffered a seizure (Tr. 160).  A hospital note indicated that Plaintiff had not taken the seizure medication, Dilantin for two years, because she could not "afford it" (Tr. 161, 164).  Two days later, on June 28, 2004, a treatment note discussed a CT scan of Plaintiff's neck that showed soft tissue prominence in the nasopharynx that was less apparent than on a previous study (Tr. 168, 186).  The CT scan showed that no defined mass was present and that there was no evidence of cervical adenopathy (Tr. 168).

On July 12, 2004, Plaintiff complained to Dr. Hegyi of soreness in her left submandibular area, stating that it swelled up when she ate (Tr. 167).  An examination of Plaintiff's ears did not reveal any problems (Tr. 167).  A treatment note dated July 26, 2004, included Plaintiff's complaint of dizzy spells and of experiencing another seizure (Tr. 196).  Plaintiff also

-6-

complained of frequent urination (Tr. 196). Dr. Tom submitted a letter in which he discussed a recent visit of October 13, 2005 (Tr. 279). In this letter, Dr. Tom identified six medical problems for Plaintiff: (1) nasopharyngeal carcinoma; (2) seizure disorder; (3) hypothyroidism; (4) depression; (5) cervical radiculopathy; and (5) hypertension (Tr. 279). Dr. Tom noted that Plaintiff lived with her family because she was unable to obtain a job (Tr. 279). Twice in this letter, Dr. Tom commented upon Plaintiff's severe depression (Tr. 279).

On March 6, 2006, Plaintiff was seen at the Lewerenz Medical Center complaining that she had been sick for one week with congestion and a runny nose (Tr. 350). Plaintiff also reported that she had been vomiting on a daily basis, and she stated that it felt as if food was getting "stuck" in her throat (Tr. 350).

On March 21, 2006, Plaintiff saw Ronald J. Rasansky, D.O., for her inability to eat (Tr. 360-61). Dr. Rasansky reported that Plaintiff had this problem for almost one year (Tr. 360). Dr. Rasansky observed that Plaintiff had not really lost any weight over the past year and he noted that "her symptoms are, otherwise, fairly vague" (Tr. 360). Dr. Rasansky ordered an upper GI endoscopy (Tr. 361). On April 4, 2006, Stephen M.J. Hoffman, D.O., did the endoscopy and reported that it produced normal results except for a minimal sub-epitheal mass (Tr. 357). Dr. Hoffman recommended a solid phase gastric emptying study (Tr. 357). The gastric emptying study, done on April 12, 2006, showed a significant delay in gastric emptying, which was suggestive of either severe atony or gastric outlet obstruction (Tr. 348, 379).

A treatment note dated May 12, 2006 stated that Plaintiff was seen for follow-up for nasopharyngeal carcinoma (Tr. 304). This note reported that Plaintiff had two recent MRIs, one

on April 21, 2006, and the other on April 25, 2006, of her head and her nasopharynx and the note stated that these studies were "all within normal limits" (Tr. 304).

On May 22, 2006, Benjamin J. Paolucci, D.O., removed Plaintiff's gall bladder (a cholecystectomy) on an outpatient basis, without difficulty (Tr. 289). One week after the operation, Dr. Paolucci told Plaintiff to resume normal activity (Tr. 289).

On June 30, 2006, Plaintiff returned to the Lewerenz Center and complained that nothing had changed in that she was still vomiting and experiencing dizziness and lightheadedness (Tr. 340). Dr. Lewerenz diagnosed a toxic Dilantin level and sent Plaintiff to the emergency room (ER) at St. John Hospital (Tr. 340).

On July 3, 2006, a 17 channel digital EEG produced abnormal results for Plaintiff due to the presence of mild background slowing and disorganization (Tr. 296). This finding was consistent with mild encephalopathy (Tr. 296). The EEG did not reveal any definite epileptiform activity or evidence of focal cerebral dysfunction (Tr. 296).

On July 12, 2006, Plaintiff returned to the Lewerenz Center and complained of bilateral ankle swelling (Tr. 339). She acknowledged feeling better since the adjustment in her Dilantin dose (Tr. 339).

An August 2, 2006 note from the Lewerenz Center included a notation that stated "totally disabled" (Tr. 338). On August 16, 2006, Plaintiff complained of left arm numbness and tingling in her fingers (Tr. 336).

On August 21, 2006, Plaintiff saw physician assistant, Kerry L. Nathan, at the B.G. Tri-County Neurology and Sleep Clinic after a referral by Dr. Lewerenz (Tr. 301-02). Plaintiff told

Mr. Nathan that she had suffered three seizures (Tr. 301). She stated that she had her first seizure in 1998, after being diagnosed with sinus cancer and undergoing chemo and radiation therapy (Tr. 301). Then, Plaintiff remained seizure-free until June 26, 2004, when she had a grand mal seizure (Tr. 301). Plaintiff had her third seizure on June 26, 2005 (Tr. 301). After conducting a physical examination, Mr. Nathan noted that Plaintiff had been seizure-free for more than one year (Tr. 302). Mr. Nathan reported Plaintiff's complaints of paresthesias and stated he would schedule an EMG study (Tr. 302).

On September 15, 2006, an EMG/NCV study revealed mild carpal tunnel syndrome in Plaintiff's left upper extremity, with no radiculopathy (Tr. 298).

On October 3, 2006, a CT scan of Plaintiff's right shoulder gave a clinical indication of a frozen shoulder with no fracture seen (Tr. 334). There was no evidence of a rotator cuff tear (Tr. 334). On October 30, 2006, Plaintiff told Dr. Lewerenz that she had been dizzy and she complained of swelling in both hands, "cottonmouth," fatigue, excessive thirst, and frequent urination (Tr. 331). On December 1, 2006, Plaintiff stated that she had started vomiting again (Tr. 330).

On January 9, 2007, Plaintiff returned to Dr. Rasansky and provided a history of transfer dysphagia (difficulty swallowing) (Tr. 353). Dr. Rasansky prescribed two new medications and ordered a modified barium swallow (Tr. 354). However, before that study was done, Plaintiff had an esophagogastroduodenoscopy procedure that produced findings suggestive of eosinophillic esophagitis, with biopsies done for these findings (Tr. 351). Otherwise, according to Dr. Hoffman, this was a normal study (Tr. 351). Dr. Hoffman recommended waiting for the

biopsy results, and, stated that if they were negative, then he would recommend the modified barium swallow (Tr. 351).

On February 2, 2007, Plaintiff told Dr. Lewerenz that medications prescribed by Dr. Rasansky had helped her, but that she had not had a bowel movement in 2-3 weeks, and that her headaches, dizziness, and vomiting had returned (Tr. 326).

On May 9, 2007, Dr. Lewerenz ordered a cardiac stress test to evaluate Plaintiff's shortness of breath (Tr. 319). Plaintiff exercised on the treadmill for seven and one-half minutes and demonstrated an average exercise tolerance for a person her age (Tr. 319).

On May 21, 2007, Plaintiff told Dr. Lewerenz that she could barely eat without experiencing pain and bloating (Tr. 318). On June 8, 2007, Dr. Lewerenz reported that Plaintiff continued to have chronic constipation and that she was vomiting again (Tr. 315). On July 23, 2007, Plaintiff told Dr. Lewerenz that nothing was working (Tr. 430). On August 6, 2007, Plaintiff reported that Antivert helped "some" with her dizziness (Tr. 429). As of a most recent examination of August 14, 2007, Dr. Rasansky filled out a form entitled "Gastrointestinal Disorders - Impairment Questionnaire" (Tr. 364-69). Dr. Rasansky indicated that he started treating Plaintiff on March 24, 2006 (Tr. 364). He did not respond to the question asking about frequency of treatment (Tr. 364). Dr. Rasansky identified the clinical findings as loss of appetite, malaise, fatigue, nausea, and pain (Tr. 365). He did not respond to the question that asked him to identify laboratory and diagnostic test results which demonstrated or supported his diagnosis (Tr. 365). Although Dr. Rasansky opined that Plaintiff was capable of performing low-stress work, he also opined that she could sit for 0-1 hours and stand/walk for 0-1 hours

-10-

during a workday (Tr. 367).  Dr. Rasansky also opined that Plaintiff could occasionally lift and carry up to ten pounds (Tr. 368).  According to Dr. Rasansky, Plaintiff experienced "good" and "bad" days that would cause her to miss work more than three times each month (Tr. 368).

On August 28, 2007, Dr. Hoffman performed a second esophagogastroduodenoscopy study and reported that it showed gastroesophageal reflux disease, in an otherwise normal EGD (Tr. 370).  These findings suggested that Plaintiff's symptoms were caused by acid reflux and Dr. Hoffman recommended that acid suppression with a PPI once or twice every thirty minutes would help Plaintiff (Tr. 370).

On September 27, 2007, Dr. Lewerenz sent a letter and listed twelve diagnoses for Plaintiff (Tr. 362).  He stated that Plaintiff was unable to participate in normal daily activities without pain, angst, and discomfort (Tr. 362).  Dr. Lewerenz also opined that Plaintiff had been "completely and continuously" unable to perform her previous occupation due to her physical infirmity, and he stated that he did not see "any significant improvement now or in the future" (Tr. 362).

### 3.    Vocational Expert

Vocational Expert James Fuller testified that Plaintiff performed unskilled, light work as a housekeeper (Tr. 539).  Thus, Mr. Fuller agreed that if Plaintiff could stand for six of eight hours in an eight-hour day, she could return to that type of work (Tr. 539).  However, if Plaintiff experienced the symptoms that she testified about, including the dizziness and the nausea, she could not perform that work (Tr. 539).

### C.      *Plaintiff's Claims of Error*

Plaintiff raises three arguments on appeal, namely: (1) that the ALJ failed to give appropriate deference to Plaintiff's "treating" physicians – in particular Drs. Lewerenz and Rasansky – and/or failed to give adequate reasons for rejecting Drs. Lewerenz and Rasansky's opinions that Plaintiff was unable to maintain employment; (2) that the ALJ relied on flawed Vocational Expert testimony, specifically, that the ALJ posed a hypothetical question to the VE based upon the ALJ's opinion of Plaintiff's abilities, as opposed to a hypothetical question based upon the opinion of Plaintiff's physicians; and (3) that the ALJ failed to properly evaluate Plaintiff's credibility.

## III.    DISCUSSION

### A.      *Standard of Review*

In enacting the Social Security system, Congress created a two-tiered system in which the administrative agency handles claims, and the judiciary merely reviews the agency determination for exceeding statutory authority or for being arbitrary and capricious.  *Sullivan v. Zebley*, 493 U.S. 521 (1990).  The administrative process itself is multifaceted in that a state agency makes an initial determination that can be appealed first to the agency itself, then to an ALJ, and finally to the Appeals Council.  *Bowen v. Yuckert*, 482 U.S. 137 (1987).  If relief is not found during this administrative review process, the claimant may file an action in federal district court.  *Id.*; *Mullen v. Bowen*, 800 F.2d 535, 537 (6th Cir. 1986).

This Court has original jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g).  Judicial review under this statute is limited in that the

court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record." *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005); *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). In deciding whether substantial evidence supports the ALJ's decision, "we do not try the case de novo, resolve conflicts in evidence, or decide questions of credibility." *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007); *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). "It is of course for the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 247 (6th Cir. 2007); *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 475 (6th Cir. 2003) (an "ALJ is not required to accept a claimant's subjective complaints and may...consider the credibility of a claimant when making a determination of disability."); *Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 542 (6th Cir. 2007) (the "ALJ's credibility determinations about the claimant are to be given great weight, particularly since the ALJ is charged with observing the claimant's demeanor and credibility.") (quotation marks omitted); *Walters*, 127 F.3d at 531 ("Discounting credibility to a certain degree is appropriate where an ALJ finds contradictions among medical reports, claimant's testimony, and other evidence."). "However, the ALJ is not free to make credibility determinations based solely upon an 'intangible or intuitive notion about an individual's credibility.'" *Rogers*, 486 F.3d at 247, quoting, Soc. Sec. Rul. 96-7p, 1996 WL 374186, *4.

   If supported by substantial evidence, the Commissioner's findings of fact are conclusive. 42 U.S.C. § 405(g). Therefore, this Court may not reverse the Commissioner's decision merely

because it disagrees or because "there exists in the record substantial evidence to support a different conclusion." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006); *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (*en banc*). Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers*, 486 F.3d at 241; *Jones*, 336 F.3d at 475. "The substantial evidence standard presupposes that there is a 'zone of choice' within which the Commissioner may proceed without interference from the courts." *Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994) (citations omitted), citing, *Mullen*, 800 F.2d at 545.

The scope of this Court's review is limited to an examination of the record only. *Bass*, 499 F.3d at 512-13; *Foster v. Halter*, 279 F.3d 348, 357 (6th Cir. 2001). When reviewing the Commissioner's factual findings for substantial evidence, a reviewing court must consider the evidence in the record as a whole, including that evidence which might subtract from its weight. *Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992). There is no requirement, however, that either the ALJ or the reviewing court must discuss every piece of evidence in the administrative record. *Kornecky v. Comm'r of Soc. Sec.*, 167 Fed.Appx. 496, 508 (6th Cir. 2006) ("[a]n ALJ can consider all the evidence without directly addressing in his written decision every piece of evidence submitted by a party.") (internal citation marks omitted); *see also Van Der Maas v. Comm'r of Soc. Sec.*, 198 Fed.Appx. 521, 526 (6th Cir. 2006).

-14-

### B.      Governing Law

The "[c]laimant bears the burden of proving [her] entitlement to benefits."  *Boyes v. Sec'y of Health & Human Servs.*, 46 F.3d 510, 512 (6th Cir. 1994); *accord, Bartyzel v. Comm'r of Soc. Sec.*, 74 Fed.Appx. 515, 524 (6th Cir. 2003).  There are several benefits programs under the Act, including DIB benefits of Title II (42 U.S.C. §§ 401 *et seq*.) and SSI benefits of Title XVI (42 U.S.C. §§ 1381 *et seq*.).  While the two programs have different eligibility requirements, "DIB and SSI are available only for those who have a 'disability.'"  *Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007).  "Disability" means:

> inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A) (DIB); *see also*, 20 C.F.R. § 416.905(a) (SSI).

The Commissioner's regulations provide that disability is to be determined through the application of a five-step sequential analysis:

> Step One:  If the claimant is currently engaged in substantial gainful activity, benefits are denied without further analysis.
>
> Step Two:  If the claimant does not have a severe impairment or combination of impairments, that "significantly limits...physical or mental ability to do basic work activities," benefits are denied without further analysis.
>
> Step Three:  If the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the severe impairment meets or equals one of the impairments listed in the regulations, the claimant is conclusively presumed to be disabled regardless of age, education or work experience.

-15-

Step Four: If the claimant is able to perform his or her past relevant work, benefits are denied without further analysis.

Step Five: Even if the claimant is unable to perform his or her past relevant work, if other work exists in the national economy that plaintiff can perform, in view of his or her age, education, and work experience, benefits are denied.

*Carpenter v. Comm'r of Soc. Sec.*, 2008 WL 4793424 (E.D. Mich. 2008), citing, 20 C.F.R. §§ 404.1520, 416.920; *Heston*, 245 F.3d at 534. "If the Commissioner makes a dispositive finding at any point in the five-step process, the review terminates." *Colvin*, 475 F.3d at 730.

"Through step four, the claimant bears the burden of proving the existence and severity of limitations caused by her impairments and the fact that she is precluded from performing her past relevant work." *Jones*, 336 F.3d at 474, cited with approval in *Cruse*, 502 F.3d at 540. If the analysis reaches the fifth step without a finding that the claimant is not disabled, the burden transfers to the Commissioner. *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 643 (6th Cir. 2006). At the fifth step, the Commissioner is required to show that "other jobs in significant numbers exist in the national economy that [claimant] could perform given [his] RFC and considering relevant vocational factors." *Rogers*, 486 F.3d at 241; 20 C.F.R. §§ 416.920(a)(4)(v) and (g).

### C.    *Analysis and Conclusions*

The ALJ made his decision at step four of the five-step analysis discussed above. The ALJ determined Plaintiff had the residual functional capacity (RFC) to perform unskilled light exertional work, which included Plaintiff's past relevant work as a housekeeper. *See* 20 C.F.R.

-16-

§§ 404.1520(a)(4)(iv), 416.920(a)(iv); 20 C.F.R. §§ 404.1545, 416.945. The term "residual

functional capacity" is defined as the most work an individual can do after considering the effects

of physical and/or mental limitations that affect the ability to perform work-related tasks. *See* 20

C.F.R. §§ 404.1545, 416.945, SS-R 96-8p.

After determining the Plaintiff's RFC, an ALJ must compare it to the requirements of the

Plaintiff's past relevant work. 20 C.F.R. §§ 404.1560(a), 416.960(a). "Past relevant work" is

"work that you have done within the past 15 years, that was substantial gainful activity, and that

lasted long enough for you to learn to do it." 20 C.F.R. §§ 404.1560(b)(1), 416.960(b). If the

Plaintiff can perform her past relevant work, then she is not disabled. *Foster v. Halter*, 279 F.3d

348, 354 (6th Cir.2001); 20 C.F.R. § 404.1520(f). Here, Plaintiff argues that the ALJ's decision

at step four is not supported by substantial evidence.

Plaintiff argues primarily that the ALJ erred by failing to give controlling weight to her

treating physicians' opinions regarding the limitations that Plaintiff's ailments impose on her

ability to work. "Generally, the opinions of treating physicians are given substantial, if not

controlling deference." *Warner v. Commissioner*, 375 F.3d 387, 390 (6th Cir. 2004). However,

a treating physician's opinion is not entitled to controlling weight where it is not "well-supported

by medically acceptable clinical and laboratory diagnostic techniques" and is "inconsistent with

the other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(d)(2); *see Cox v.*

*Commissioner*, 295 F. App'x 27, 35 (6th Cir. 2008). Furthermore, an opinion that is based on the

claimant's reporting of her symptoms alone is not entitled to controlling weight. *See Young v.*

-17-

*Secretary of Health & Human Servs.*, 925 F.2d 146, 151 (6th Cir. 1990); *see also Smith v. Commissioner*, 482 F.3d 873, 876-77 (6th Cir. 2007).

Here, the ALJ found that the opinions of Drs. Rasansky and Lewerenz (stating that Plaintiff was "totally" disabled) were based upon Plaintiff's subjective complaints and not based upon objective clinical findings. The ALJ based this conclusion, in part, on that fact that he did not find Plaintiff's testimony entirely credible. For instance, the ALJ noted that many of Plaintiff's proclaimed ailments (*e.g.*, headaches, dizzy spells, nausea, vomiting) were not supported by the medical records, which yielded little in the way of probative findings (Tr. 26). Furthermore, the ALJ considered Plaintiff's self-described level of daily activities in weighing Plaintiff's credibility. An ALJ's findings based on the credibility of an applicant are to be accorded great weight and deference, particularly since the ALJ is charged with the duty of observing a witness's demeanor and credibility. *See Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 531 (6th Cir. 1997). The undersigned finds no reason to disturb the ALJ's credibility findings.

With the lack of objective test results in Plaintiff's favor, the ALJ rejected the opinions of Drs. Rasansky and Lewerenz as unsupported. In particular, the ALJ found that there is no link between these severe symptoms and the evidence produced between March 2006 and August 2007. Indeed, Dr. Lewerenz's treatment of Plaintiff consists primarily, if not exclusively, of his reporting of her subjective complaints. Dr. Lewerenz identified Plaintiff as "totally disabled" as of August 2, 2006, less than five months after his initial visit with Plaintiff which occurred on March 6, 2006 (Tr. 350). During those five months, Plaintiff had the two normal MRIs in April

-18-

2006 (Tr. 304), and was well enough to undergo a cholecystectomy on an outpatient basis in May

2006 (Tr. 289).  Then, a week after the removal of her gall bladder, the surgeon, Dr. Paolucci,

told Plaintiff that she could resume normal activities (Tr. 289).  In July 2006, Plaintiff had the

EEG that produced no evidence of definite epileptiform activity or of focal cerebral dysfunction

(Tr. 296).  In short, it is difficult to see what, other than Plaintiff's subjective complaints, would

lead Dr. Lewerenz to opine that she was disabled within five months of his initial visit with her.

Based on these normal test results, the ALJ had a substantial basis for rejecting the opinions of

Drs. Lewerenz and Rasansky.

Plaintiff next argues that the hypothetical question posed to the vocational expert (VE)

was inadequate.  In particular, Plaintiff avers that the hypothetical failed to accurately portray

Plaintiff's impairments.  However, a hypothetical question is not required to list the claimant's

medical conditions, but is only required to reflect the claimant's <u>limitations</u>.  *Webb v.*

*Commissioner*, 368 F.3d 629, 633 (6th Cir. 2004).  As discussed above, the ALJ found that

Plaintiff's was not fully credible and that the objective medical evidence did not support

Plaintiff's claimed limitations.  As noted above, many of the objective studies of record, either

produced completely normal results, like the two MRIs from April 2006, or produced minor

abnormal findings like the finding of mild carpal tunnel syndrome, that did not warrant any

follow-up (Tr. 298), or the EEG that showed mild background slowing or disorganization, but no

sign of epileptiform disorder or focal cerebral dysfunction (Tr. 296).  Moreover, a state agency

reviewing physician who reviewed the record in July 2003, opined that Plaintiff had no

exertional limitations (Tr. 131). Thus, the undersigned finds no error in the hypothetical question posed by the ALJ.

In sum, after review of the record, it appears that the decision of the ALJ is within that "zone of choice within which decision makers may go either way without interference from the courts," *Felisky*, 35 F.3d at 1035, as the decision is supported by substantial evidence.

## III.   RECOMMENDATION

Based on the foregoing, it is **RECOMMENDED** that Plaintiff's motion for summary judgment be **DENIED**, that Defendant's motion for summary judgment be **GRANTED** and that the findings of the Commissioner be **AFFIRMED**.

The parties to this action may object to and seek review of this Report and Recommendation, but are required to act within fourteen (14) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1), Fed. R. Civ. P. 72(b)(2). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Secretary of HHS*, 932 F.2d 505, 508 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947, 949-50 (6th Cir. 1981). The filing of objections which raise some issues, but fail to raise others with specificity, will not preserve all the objections a party might have to this Report and Recommendation. *Willis v. Secretary of HHS*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987).

Within fourteen (14) days of service of any objecting party's timely filed objections, the opposing party may file a response. The response shall address each issue contained within the objections specifically and in the same order raised.

s/Mark A. Randon
MARK A. RANDON
UNITED STATES MAGISTRATE JUDGE

Dated: December 11, 2009

_Certificate of Service_

_I hereby certify that a copy of the foregoing document was served on the parties of record on this date, December 11, 2009, by electronic and/or first class U.S. mail._

_s/Melody R. Miles_
_Case Manager to Magistrate Judge Mark A. Randon_
_(313) 234-5542_